**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**FORUMES, INC., a Maryland Corporation,**
c/o Peter Angelos Law
One Charles Center
100 N. Charles Street, 21" Floor
Baltimore, Maryland 21201

and

**CHAD LANCE,**
c/o Peter Angelos Law
One Charles Center
100 N. Charles Street, 21" Floor
Baltimore, Maryland 21201

**ANDRE COOPER**
c/o Peter Angelos Law
One Charles Center
100 N. Charles Street, 21" Floor
Baltimore, Maryland 21201

**Plaintiffs,**

**v.**

**WES W. O. MOORE, in his official capacity as the Governor of the State of Maryland and in his individual capacity,**
Office of Governor Wes Moore
100 State Circle
Annapolis, Maryland 21401

and

**ELENA QUIROZ-LIVANIS, in her official capacity as Interim Secretary of Higher Education of the State of Maryland and in her individual capacity,**
Maryland Higher Education Commission
Nancy S. Grasmick Building
10th Floor
6 North Liberty Street
Baltimore, Maryland 21201

and

**Civil Action No. 1:26-cv-4243 JRR**

**CASSIE MOTZ, in her official capacity as Chair of the Maryland Higher Education Commission and in her individual capacity,**
Maryland Higher Education Commission
217 East Redwood Street
Suite 2100
Baltimore, Maryland 21202

and

**LINDA R. GOODEN, in her official capacity as Chair of the University System of Maryland Board of Regents and in her individual capacity,**
Office of Board of Regents
University System of Maryland
3300 Metzerott Road
Aldelphi, Maryland 20783

and

**JAY A. PERMAN, MD, in his official capacity as Chancellor of the University System of Maryland and in his individual capacity,**
Office of Chancellor
University Systems of Maryland
701 East Pratt Street
Baltimore, Maryland 21202

**Defendants.**

## AMENDED COMPLAINT

Plaintiffs, ForUMES, Inc., Andre Cooper and Chad Lance (collectively referred to as "Plaintiffs"), by their undersigned counsel, for their Complaint against Defendants Wes W. O. Moore, in his official capacity as the Governor of the State of Maryland and in his individual capacity; Elena Quiroz-Livanis, in her official capacity as Interim Secretary of Higher Education of the State of Maryland and in his individual capacity, Cassie Motz, in her official capacity as Chair of the Maryland Higher Education Commission and in her individual capacity, Linda R. Gooden, in her official capacity as Chair of the University System of Maryland Board of Regents and in her individual capacity, and Jay A. Perman, MD, in his official capacity as Chancellor of

the University System of Maryland and in his individual capacity (collectively referred to as "Defendants"), states as follows:

## I. INTRODUCTION

This case began in 1890, when the University of Maryland Eastern Shore ("UMES") became Maryland's second Land-Grant college. (The University of Maryland College Park ("UMCP") became the first in 1865.) By law, because UMCP did not admit Black students, UMES was supposed to be a separate but equal Land-grant college.

Instead, UMES was and continues to be a woefully underfunded stepchild of the University System of Maryland because, as will be shown below, Maryland deliberately underfunded UMES from 1890 through the present in the amount of approximately $6 Billion Dollars. This lawsuit aims to right this horrible wrong.

## II. THE PARTIES

1. Plaintiff ForUMES, Inc. ("ForUMES"), is a non-stock corporation existing under the laws of the State of Maryland with a principal place of business at 4020 Granite Avenue, Baltimore, Maryland.

2. ForUMES is an organization consisting of current students at UMES, current faculty members of UMES, UMES alumni, and prospective UMES applicants.

3. The purpose of ForUMES as stated in its Articles of Incorporation is to conduct activities to achieve educational, research, public service, and charitable objectives for UMES, focusing on the following activities:

(i) enhancing UMES's capabilities to meet its land-grant mission by:

a) fostering private-sector initiatives and public-private and philanthropic partnerships to promote centers of academic research and program excellence in support of UMES's land-grant mission;

b) fostering research including innovative public impact research, such that UMES research improves lives and has a significant impact on economic development and growth throughout Maryland;

c) deepening community and economic engagement to include meeting workforce needs, strengthening career pathways for rural students, partnering as an economic engine of success, aligning technology and talent development, advancing manufacturing innovation, inspiring and spurring technology transfer, and engaging in public impact research;

d) addressing efforts to promote student success and retention at UMES, including college affordability, degree attainment, post-collegiate success, campus modernization, and infrastructure improvements;

e) partnering with private entities and elementary and secondary education stakeholders to build a pipeline for students that may be interested in attending UMES and promote affordable degree attainment; and

(ii) increasing the private-sector role, including the role of private businesses and foundations, in:

a) strengthening UMES through enhanced institutional planning and development, fiscal stability, and financial management;

b) upgrading institutional infrastructure, including the use of technology, to ensure the long-term viability of UMES;

c) providing professional development opportunities for UMES students to help build America's workforce in the agricultural and mechanical industries;

d) involving UMES faculty, staff, and students to support corporate research and innovation initiatives; and

e) leveraging UMES faculty, staff, and students to support public-private community partnerships, economic development, and international programs.

4. Plaintiff Chad Lance is a current student at UMES.

5. Plaintiff Andre Cooper is a current student at UMES.

6. Plaintiffs have been injured due to Defendants' ongoing racial discrimination and seeks to enforce their rights under the United States Constitution as well as federal statutes and regulations.

7. Defendant Wes W. O. Moore (the "Governor") is sued in his official capacity as the Governor of the State of Maryland and in his individual capacity. The Governor's principal place of business is located at 100 State Circle, Annapolis, Maryland.

8. The Governor proposes the annual budget which includes funding allocations for colleges within the University System of Maryland ("USM") including UMCP and UMES. Md. Const. Art. 3, § 52.

9. Defendant Elena Quiroz-Livanis (the "Higher Education Secretary") is sued in her official capacity as the Interim Secretary of Higher Education of the State of Maryland and in her individual capacity. The Higher Education Secretary's principal place of business is located at 217 East Redwood Street, Suite 2100, Baltimore, Maryland.

10. In her official capacity, the Higher Education Secretary must select and direct the staff of Maryland Higher Education Commission ("MHEC") and ensure the implementation of MHEC policies and decisions. *See* Md. Code Ann. Educ. § 11-104(b)(1).

11. Defendant Cassie Motz (the "MHEC Chair") is sued in her official capacity as Chair of the MHEC and in her individual capacity. The MHEC Chair's principal place of business is located at 217 East Redwood Street, Suite 2100, Baltimore, Maryland.

12. MHEC is an agency and instrumentality of, and created by, the State of Maryland.

13. As an agency and instrumentality of the State of Maryland, MHEC shall: a) "ensure that the State Plan for Higher Education complies with the State's equal educational opportunity obligations under State and federal law, including Title VI of the Civil Rights Act," Md. Code Ann. Educ. § 11-105(b)(2)(ii); b) "assure that courses and programs offered are within the scope of the approved missions of the regional higher education centers," Md. Code Ann. Educ. § 11-105(d)(1)(ii)(4); and c) "develop plans for the desegregation of Maryland institutions and the

enhancement of HBCUs, and report to the Governor on the state's compliance with such desegregation and equal education opportunity plans." See Md. Code Ann. Educ. § 11-105(f).

14. Upon information and belief, MHEC receives federal land-grant funds from the federal government and distributes those funds, along with the required state matching to UMCP and UMES in accordance with the budgets recommended by the Governor and approved by the General Assembly.

15. Linda R. Gooden, (the "USM Chair"), is sued in her official capacity as Chair of the USM Board of Regents and in her individual capacity.

16. The USM is a public corporation with its principal place of business located at 3300 Metzerott Road, Adelphi, Maryland.

17. The Board of Regents comprises 21 members and governs the USM. The members are appointed by the Governor, President of the Senate, and the Speaker of the House of Delegates.

18. The Board of Regents oversees the USM's academic, administrative, and financial operations, formulates policy, and appoints the USM Chancellor and the presidents of the USM's member institutions, including UMCP and UMES.

19. The presidents of each of the USM's member institutions, including UMCP and UMES, submit their annual operating and capital budget requests to the Chancellor's Office.

20. Upon information and belief, the USM Board of Regents reviews the various budget requests, approves and/or rejects the budget requests, and forwards the budget requests to the Governor, the General Assembly and MHEC.

21. Defendant Jay A. Perman, MD (the "Chancellor") is sued in his official capacity as Chancellor of the USM and in his individual capacity. The Chancellor's principal place of business is located at 701 East Pratt Street, Baltimore, Maryland.

22. The Chancellor is the Chief Executive Officer of the USM and the Chief of Staff for the Board of Regents. Md. Code Ann. Educ. § 12-108.

23. The Chancellor shall, among other things, "(i) Advise the Board of Regents on systemwide policy; (ii) Conduct systemwide planning; (iii) Coordinate and arbitrate among the institutions and centers of the University; (iv) Assist the institutions in achieving performance goals in accordance with their adopted performance accountability plan; . . . and (vii) See that the policies of the Board are carried out." *Id.*

## II. JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Plaintiffs' claims for relief arise, in part, under the Fourteenth Amendment to the U.S. Constitution, various Federal Land-Grant Acts including but not limited to the Morrill Act of 1862, the Morrill Act of 1890, 7 U.S.C.A. § 301, *et seq.*, the Hatch Act of 1887, 7 U.S.C. §361a, et seq., the Smith-Lever Act of 1914, Section VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d, the corresponding regulations promulgated by the United States Departments of Agriculture, 7 C.F.R. § 15.1, *et seq.*, and Education 34 C.F.R. § 100.1, *et seq.*, and 42 U.S.C. § 1981, *et seq*.

25. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because all the events and omissions giving rise to Plaintiffs' claims occurred in the State of Maryland. In addition, all Defendants reside in this State.

## III. THE LAW

26. "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty,

or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

27. "[I]n the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment." *Brown v. Board of Education*, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873, 38 ALR2d 1180 (1954).

28. "If the State perpetuates policies and practices traceable to its prior system that continue to have segregative effects-whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system-and such policies are without sound educational justification and can be practicably eliminated, the State has not satisfied its burden of proving that it has dismantled its prior system. Such policies run afoul of the Equal Protection Clause, even though the State has abolished the legal requirement that whites and blacks be educated separately and has established racially neutral policies not animated by a discriminatory purpose." *United States v. Fordice*, 505 U.S. 717, 731–32, 112 S. Ct. 2727, 2737, 120 L. Ed. 2d 575 (1992).

*29.* Federal courts may grant prospective injunctive relief against responsible state officials to halt ongoing intentional discrimination violating the Equal Protection Clause and may require affirmative measures necessary to remedy an established unconstitutional segregated system. *See Ex parte Edward Young,* 209 U.S. 123, 157-160 28 S.Ct. 441, 52 L.Ed. 714 (1908); and *Brown v. Board of Education*, 349 U.S. 294, 299-301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

30. "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Civil Rights Act of 1964 § 601, 42 U.S.C. § 2000d.

31. "[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *Gratz v. Bollinger*, 539 U.S. 244, 276, 123 S. Ct. 2411, 2431, 156 L. Ed. 2d 257 (2003).

32. "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . title VI of the Civil Rights Act of 1964 . . ." Civil Rights Remedies Equalization Act, 42 U.S.C.A. § 2000d-7(a)(1).

33. "In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." 42 U.S.C.A. § 2000d-7(a)(2).

34. "[P]rivate individuals may sue to enforce 601 of Title VI and obtain both injunctive relief and damages." *Alexander v Sandoval*, 532 US 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

## IV. ALLEGATIONS COMMON TO ALL COUNTS

### A. The beginnings of Land-Grant Colleges

35. One of today's manifestations of white supremacy can be found in the national land-grant college program.

36. The tremendous success of today's agricultural, advanced science, and engineering industries can be directly traced to the passage of the Morrill Act of 1862 (the "First Morrill Act").

37. Prior to Congress's passage of the First Morrill Act, post-secondary education in the United States was usually limited to normal schools that taught teachers, religious schools that taught clergy, and private schools that catered to the "elite class" and were financially out of reach for most people.

38. The Maryland General Assembly chartered the Maryland Agricultural College, UMCP's predecessor, for its white citizens on March 6, 1856.[1]

39. UMCP's curriculum focused heavily on agriculture, plant and animal sciences and the mechanic arts, including basic engineering.

40. Recognizing the need to provide valuable education to the masses in the fields of agriculture and engineering, the First Morrill Act provided a one-time grant of federal land or scrip to the states (that were not in rebellion at the time).

41. The states, in turn, sold the land or scrip and used the proceeds to endow educational institutions ("land-grant colleges") that focused on agriculture and the mechanic arts (referred to as engineering today).

42. Anxious to gain access to the benefits of the First Morrill Act, Maryland's General Assembly assented to its terms on February 17, 1864.

43. The General Assembly designated UMCP, which denied admission to Black students, as Maryland's land-grant college in 1865.

44. After the Civil War, the states formerly in rebellion became eligible for the benefits of the First Morrill Act.

45. Even though segregation was still legal at the time, several southern states opted to use a portion of the First Morrill Act funds to fund separate institutions for Black students.

[1] For the purposes of consistency, the use of UMCP will apply to all historical references to MAC and its intermediate name changes.

46. Over the following decades, it became apparent that the 1862 land-grant colleges needed additional funding to remain in operation.

47. Thus, the Morrill Act of 1890 (the "Second Morrill Act") provided an annual appropriation to the 1862 land-grant institutions.

48. However, funds from the Second Morrill Act were not available to states with racially discriminatory admission policies.

49. The Second Morrill Act stopped short of requiring integration and instead permitted states with racially discriminatory admission policies to receive the annual appropriation if the state: (1) provided an institution of like kind and character for Black students; and (2) shared the Second Morrill Act funds equitably with the institution for the Black students.

50. This exception spawned the historically Black 1890 land-grant colleges.

51. As a result of the southern States' explicit embrace of white supremacy through de jure segregation, most of the 1890 land-grant colleges are located in States that made slavery lawful or supported it, including Maryland.

52. Decade after decade, northern white supremacists placed 1862 land-grant colleges almost universally out of reach of Black students by implementing nearly insurmountable de facto segregative barriers to admission of Black students such as application and tuition fees, discriminatory standardized testing requirements and lack of funding and support for K-12 education in Black communities.

53. As the number of 1862 and 1890 land-grant institutions grew, so did the First Morrill Act's mission of providing agricultural, scientific and engineering education to the masses.

54. By 1914, the land-grant mission expanded to three pillars.

55. The first is education, with a mission of delivering high-quality, accessible education in applied agricultural sciences and engineering (“Instructional Component”).

56. Research is the second pillar which conducts innovative studies and publishes research results in peer reviewed journals, especially in agriculture and technology, to solve real-world problems (“Research Component”).

57. The third pillar is extension and seeks to disperse the knowledge gained through the other two pillars to the public through outreach programs, helping communities improve farming, health, and economic practices (“Public Service Component”).

58. Today, there are a total of fifty-seven (57) 1862 land-grant institutions in the United States with at least one in every state.

59. Of these 1862 land-grant institutions, thirty (30) also serve as the flagship university for their respective state.

60. 1862 land-grant institutions are both major centers of advanced instruction in agriculture and engineering and powerful drivers of economic development through, among other sources, government grants, private research projects and private-public partnerships.

61. The impact of the First Morrill Act, along with its progeny, on Maryland’s post-secondary education and economy has been nothing short of astounding.

62. From its meager beginnings as a small, struggling, racially segregated agricultural college in 1856, UMCP rose meteorically over the decades as a direct result of its status as Maryland’s white 1862 land-grant institution.

63. UMCP is now not only Maryland’s flagship university but is also considered to be a public ivy league institution.

64. UMCP's core land-grant mission, which has its roots in agriculture, applied science and engineering, but has expanded to include science, engineering, environmental and natural resource management, technology, innovation, entrepreneurship, and economic development, draws in hundreds of millions of federal, state and private dollars every year.

65. This is truly a great success story for the white people of Maryland.

**B. The Land-Grant Mission Expands**

66. On March 2, 1887, Congress passed the Hatch Act which provided federal money to land-grant colleges for the Research Component of the land-grant mission.

67. The Hatch Act provides, in pertinent part, as follows:

> That in order to aid in acquiring and diffusing among the people of the United States useful and practical information on subjects connected with agriculture, and to promote scientific investigation and experiment respecting the principles and applications of agricultural science, **there shall be established, under direction of the college or colleges or agricultural department of colleges in each State or Territory established, or which may hereafter be established, in accordance with the provisions of [the First Morrill Act] or any of the supplements to said act, a department to be known and designated as an "agricultural experiment station:"** *Provided*, **That in any State or Territory in which two such colleges have been or may be so established the appropriation hereinafter made to such State or Territory shall be equally divided between such colleges, unless the legislature of such State or Territory shall otherwise direct**.

*Id.*, (emphasis added).

68. Congress clearly and unambiguously placed several conditions on the receipt of federal funds under the Hatch Act, including: (1) 1862 land-grant institutions and all land-grant institutions established thereafter under any supplements to the First Morrill Act were required to establish an agricultural experiment station; and (2) States with two land-grant colleges were required to share Hatch Act appropriations equally between the two colleges unless otherwise directed by the State legislature.

69. While the Hatch Act did not originally require states to provide matching funds to remain eligible for Hatch Act appropriations, state matching requirements began to appear in amendments to the Hatch Act in 1955. *See*, *e.g*., Aug. 11, 1955, c. 790, § 1, 69 Stat. 671.

70. The Maryland General Assembly assented to the terms of the Hatch Act on March 6, 1887, and designated UMCP as the recipient of those funds.

71. In 1888, the General Assembly established the Maryland Agricultural Experiment Station ("MAES") as part of UMCP and located the Station on UMCP's campus.

72. Nicknamed "the Farm", MAES included crop fields, livestock, orchards and other facilities.

73. As a result of the sustained economic downturn following the end of the Civil War, many land-grant colleges, including UMCP, continued to face dire financial straits.

74. In order to provide land-grant colleges with additional federal funds, Congress passed the Second Morrill Act in 1890.

75. By its express terms, the Second Morrill Act was a supplement to the First Morrill Act.

76. Schools established under the Second Morrill Act were therefore also subject to the terms and conditions of the Hatch Act and thus entitled to an equal share of Hatch Act funds unless otherwise directed by the respective state legislatures.

77. The Second Morrill Act would provide federal money to land-grant colleges on a yearly basis for the Instructional Component of the land-grant mission: but there was a catch.

78. In order to qualify for the money under the Second Morrill Act, states could not discriminate on the basis of race or color in the admission of students.

79. States could, however, provide separate schools for Black students under the following conditions:

> . . . *Provided*, That in any State in which there has been one college established in pursuance of the act of July second, eighteen hundred and sixty-two [the First Morrill Act], and **also in which an educational institution of like character has been established, or may be hereafter established, and is now aided by such State from its own revenue, for the education of colored students in agriculture and the mechanic arts**, however named or styled, or whether or not it has received money heretofore under the act to which this act is an amendment, **the legislature of such State may propose and report to the Secretary of the Interior a just and equitable division of the fund to be received under this act between one college for white students and one institution for colored students established as aforesaid which shall be divided into two parts and paid accordingly, and thereupon such institution for colored students shall be entitled to the benefits of this act and subject to its provisions, as much as it would have been if it had been included under the act of eighteen hundred and sixty-two**, and the fulfillment of the foregoing provisions shall be taken as compliance with the provision in reference to separate colleges for white and colored students.

Second Morrill Act (italics in original) (bold added).

80. Congress clearly and unambiguously placed two conditions on the receipt of federal funds under the Second Morrill Act for States that desired to maintain a racially segregated education system: (1) the educational institution for Black students had to be of "like character" as that for white students (the "Parity Clause"); and (2) the funding was shared equitably between the racially segregated schools (the "Equity Clause").

81. Under the Second Morrill Act's Parity Clause, States such as Maryland that perpetuated segregation were required to provide land-grant colleges for Black students with their own agricultural research stations.

82. Under the Second Morrill Act's Equity Clause, States such as Maryland that perpetuated segregation were required to equitably distribute funding from the Second Morrill between their white and Black land-grant colleges.

83. Under the express terms of the Second Morrill Act, once these conditions were met, the schools established for Black students would be accorded the same benefits under the Second Morrill Act as the schools established under the First Morrill Act (the "Retroactive Clause").

84. The Retroactive Clause, when read in conjunction with the Hatch Act, also required States, such as Maryland, that perpetuated segregation to equally distribute funding from the Hatch Act between their white and Black land-grant colleges.

85. The Second Morrill Act went on to explicitly enumerate the consequences for States that failed to abide by the foregoing terms and conditions:

> That if any portion of the moneys received by the designated officer of the State or Territory for the further and more complete endowment, support, and maintenance of colleges, or of institutions for colored students, as provided in this act, **shall, by any action or contingency, be diminished or lost, or be misapplied, it shall be replaced by the State or Territory to which it belongs, and until so replaced no subsequent appropriation shall be apportioned or paid to such State or Territory** . . .

Second Morrill Act (emphasis added).

86. Henry E. Alvord, UMCP's President at that time, was in a dilemma.

87. UMCP was in desperate need of additional funding but the idea of permitting Black students to attend UMCP was unfathomable because his and many others' racist beliefs would never allow UMCP to be integrated.

88. President Alvord needed to find a solution where he could channel the lion's share of the new federal funding under the Second Morrill Act to UMCP while preserving segregation.

89. He settled upon a small, remote and run-down preparatory school on the southern point of the eastern shore as the solution.

90. In the final months of 1890, President Alvord began negotiations with the Chairman of Morgan College, John F. Goucher, to operate Princess Anne Academy as Maryland's Black land-grant college.

91. On December 31, 1890, the negotiations culminated in a written contract containing the following provisions:

- **UMCP will adopt Princess Anne Academy as the "Eastern Branch of the Maryland Agricultural College" for "the instruction of persons of African descent and in furtherance thereof, to apply, from the amount received by the said first party under an Act of Congress approved August 30, 1890**." (Emphasis added).
- Morgan College will maintain and operate Princess Anne Academy, "so that the general provisions for instruction **shall be of like character or similar in kind, with the provisions maintained for white students at the Maryland Agricultural College**, and satisfactory to the Board of Trustees of that College." (Emphasis added)
- Morgan College will provide instruction in the agricultural and mechanical arts, "to all pupils of said Academy desiring the same and to extend all the educational and economic facilities of said Academy, including the special instruction, free of all charges of tuition, use of tools, etc., **to any and all persons of African descent admitted to said College according to its published terms and assigned to the said Eastern Branch**, so long as they properly conform to the general rules and regulations of said Academy or Branch." (Emphasis added)
- The declared purpose and intent of the contract is, " to provide, during its continuance, **for the youth of Maryland of the colored race, like facilities for general education, and especially for instruction in Agriculture and Mechanic Arts, conducted in a separate school, to those provided for the white youth of Maryland, and thus to conform in spirit and letter to the provisions of the Act of Congress approved August 30, 1890**, for the more complete endowment and support of the Colleges for the benefit of Agriculture and the Mechanic Arts." (Emphasis added)

92. Under this artifice, President Alvord represented to federal officials that UMCP did not discriminate in its admissions process because all qualified applicants were admitted to UMCP regardless of their race or color.

93. He failed to mention however, that the Black students would be sent to far-off Princess Anne to receive junior and senior high school-level classes on Princess Anne Academy's dilapidated campus instead of a school of "like character" to UMCP's state-of-the-art college

campus and that the plan was that no graduate of Princess Anne Academy would ever be admitted to UMCP.[2]

94. Moreover, President Alvord deceitfully neither equitably distributed Second Morrill Act funds nor equally distributed Hatch Act funds between UMCP and Princess Anne Academy.

95. While President Alvord was less than candid with federal officials, he was completely transparent with Maryland's Legislature and Governor.

96. As part of his statutory obligations as the President of UMCP, President Alvord was required to submit a report on UMCP's status at every session of the Legislature.

97. On January 29, 1891, President Alvord submitted his "Annual Report of the Maryland Agricultural College for the Year 1890" to the UMCP Board of Trustees which included several notable passages regarding his response to the Second Morrill Act, including the following:

- a recitation of the allowance for separate colleges for Black students, "if of like character with the parent institution";
- reference to the Board of Trustees' desire to "fully meet the spirit of the new law" by sending Black students to Princess Anne Academy;
- confirmation of the contract entered into between MAC and Morgan College regarding Princess Anne Academy's role in fulfilling the Second Morrill Act's segregation safe harbor provision;
- a statement that UMCP supported Princess Anne Academy and would make it of "like character" to UMCP by "equitably sharing" the new federal funds; and
- an admission of the scheme used to deprive Princess Anne Academy of land-grant funding: "[UMCP] **consequently continues to be the only institution in this State recognized by law as entitled to the benefits of the Act of Congress of August 30th, 1890, and continues to admit students without distinction of race or color, but will assign all colored students admitted, to its Eastern Branch, which is 'an educational institution of like character.'** This College thus conforms to the spirit of the law, as well as its letter, and to the rulings of the Interior Department. Similar provisions have been made in other States, with the approval of the Secretary of the Interior." (Emphasis added)

[2] Princess Anne Academy is UMES's predecessor. For the purposes of consistency, the use of UMES will apply to all historical references to Princess Anne Academy and its intermediate name changes.

98. By law (Chapter 326, 1888), the Governor, the President of the Senate, and the Speaker of the House of Delegates were members of the UMCP Board of Trustees and, as such, were fully briefed on Alvord's scheme.

99. Neither the General Assembly nor the Governor expressed any concerns or objections about the propriety of President Alvord's racist scheme.

100. To the contrary, governmental inaction was a tacit endorsement.

101. Further, the Governor and General Assembly formally ratified this racist scheme by officially accepting the terms of the Second Morrill Act on March 15, 1892 and failing to provide a formula for equitably dividing the federal funds between UMCP and UMES as required by the Second Morrill Act.

102. In his subsequent 1892 Report to the UMCP Board of Regents, President Alvord clearly revealed his belief that the upkeep and functions of the Farm (funded by Hatch Act funds) were equally vital to and integrated with the Instructional Component of UMCP's land-grant mission (funded by the First and Second Morrill Acts) with the following statement: "…the new income [1890 Morrill Act funds] of the college, which provides for 'facilities for instruction' **has been construed to allow expenditures for stock, machinery, implements and materials for the farm, as a department of instruction**." (Emphasis added).

103. Because UMCP was a segregated campus at that time, Black students were denied access to the agricultural research facilities and equipment on UMCP's campus.

104. Despite the fact that 1890 land-grant institutions such as UMES were accorded the same legal status as 1862 land-grant institutions such as UMCP, and that UMES was to receive funding equal to UMCP's for a research station, Maryland refused to provide UMES with any Hatch Act funds.

105. As a direct result of this funding disparity, UMCP was able to expand the Farm's operations and further develop the Research Service Component of its land-grant mission while UMES offered little more than junior high courses.

106. To add insult to this intentional injury, President Alvord siphoned Second Morrill Act Instructional Component funds to support the Farm.

107. In doing so, he underscored the link between the Instructional Component of land-grant institutions and the Research Component that was kept exclusively and solely for the benefit of the white students and instructors at UMCP.

108. In 1894, utilizing land-grant funds, UMCP formalized the engineering component of its land-grant mission by establishing the School of Mechanical Engineering.

109. In 1896, the U.S. Supreme Court issued its ruling in *Plessy v. Fergusson*, ushering in the era of "separate but equal."

110. Maryland was now required by federal law to make UMES an institution of like kind and character to UMCP under both the Second Morrill Act and the Fourteenth Amendment: a legal obligation Maryland has never fulfilled.

111. This obligation included not just the Instructional Component, but the Research Component, and later, Public Service Component of UMES's land-grant mission as well.

112. In 1914, Congress passed the Smith-Lever Act which: (1) created the Public Service Component of the land-grant mission; (2) established the Cooperative Extension Service ("CES"); and (3) provided land-grant colleges with yet another stream of federal money to support the CES.

113. The goal of the Public Service Component of the land-grant mission is to disseminate the agricultural knowledge and techniques developed at the land-grant colleges, including agricultural research stations, directly to surrounding communities via CES agents.

114. The Smith-Lever Act states, in pertinent part, as follows:

> That in order to aid in diffusing among the people of the United States useful and practical information on subjects relating to agriculture and home economics, and to encourage the application of the same, there may be inaugurated in connection with the college or colleges in each State now receiving, or which may hereafter receive, the benefits of the [First Morrill Act **and the Second Morrill Act], agricultural extension work** which shall be carried on in cooperation with the United States Department of Agriculture: *Provided*, That in any State in which two or more such colleges have been or hereafter may be established the appropriations hereinafter made to such State shall be administered by such college or colleges as the legislature of such State may direct . . .

Smith-Lever Act (bold added) (italics in original).

115. The Smith-Lever Act also contained the following state matching fund requirement: ". . . no payment out of the additional appropriations herein provided shall be made in any year to any State until an equal sum has been appropriated for that year by the legislature of such State, or provided by State, county, college, local authority, or individual contributions from within the State, for the maintenance of the cooperative agricultural extension work provided for in this Act."

116. Under the Second Morrill Act's Parity Clause, States such as Maryland that perpetuated segregation were required to provide the land-grant colleges for Black students with their own CES.

117. Under the Second Morrill Act's Equity Clause, States such as Maryland that perpetuated segregation were required to equitably distribute funding from the Smith-Lever Act between their white and Black land-grant colleges.

118. Like the Second Morrill Act, the Smith-Lever Act also went on to explicitly enumerate the consequences for States that failed to abide by the Smith-Lever Act's terms and conditions:

> That if any portion of the moneys received by the designated officer of any State for the support and maintenance of cooperative agricultural extension work, as provided in this Act, **shall by any action or contingency, be diminished or lost, or be misapplied, it shall be replaced by the State to which it belongs, and until so replaced no subsequent appropriation shall be apportioned or paid to said State**. . .

Smith-Lever Act (emphasis added).

119. The General Assembly assented to the terms and conditions of the Smith-Lever act in 1914.

120. That same year, the Maryland CES ("MCES") was established at UMCP's campus.

121. Despite the Smith-Lever Act's express inclusion of 1890 land-grant colleges and the Second Morrill Act's Retroactive Clause, Maryland's General Assembly deceitfully declared UMCP to be the only land-grant college eligible for Smith-Lever funds.

122. The General Assembly also failed to equitably share Smith-Lever funds with the "Eastern Branch" of its campus.

123. As the sole designee of Smith-Lever Act funds, UMCP was responsible for the operation of MCES.

124. As a direct result of this funding disparity, in 1914, UMCP was able to go directly to work on building the infrastructure necessary to support all facets of the Public Service Component of its land-grant mission while UMES was still little more than a junior high school.

125. In addition to depriving Princess Anne of its fair share of federal land-grant funds, from 1890 to 1914, the State of Maryland provided zero general funds for the operation of UMCP's "Eastern Branch" while generously providing funds to MAC.

126. Upon information and belief, UMES did not receive its first allocation of state funds until 1915.

127. By 1915, UMCP had grown into five divisions: Engineering, College of Agriculture, Agricultural Experiment Station, Extension Service and the College of Arts and Sciences.

128. As a result of de jure segregation in the southern States and de facto segregation in the northern States, the overwhelming majority of the educational and financial benefits derived from 1890 land-grant colleges benefitted only the country's white citizens.

129. There are nineteen (19) 1890 land-grant institutions in the United States, most of which are located in former slave States, including Maryland.

130. While the desegregative intent of the Second Morrill Act is commendable, white supremacy's stranglehold on the advancement of the country's Black citizens historically funnel the overwhelming majority of state, federal and private financial and material support away from 1890 land-grant colleges to their 1862 sister colleges: a practice that continues through today.

131. Maryland's treatment of UMES is a prime example.

132. As a direct result of Maryland's overt racial discrimination against its Black population, UMES, Maryland's 1890 land-grant institution, has been overwhelmingly, intentionally and shockingly short-changed and neglected by Maryland's governing bodies from 1890 through today.

133. Unlike UMCP, which was founded to provide a college education to Maryland's white farmers, UMES was founded with the dual purpose to preserve Maryland's de jure system of racial segregation and to give UMCP access to the annual appropriation of federal funds under the Second Morrill Act.

134. Maryland's treatment of UMES has never deviated from this model.

135. While state administrators seek ways to bolster UMCP, they seek ways to hamstring and stunt the growth of UMES.

136. To this very day, the vast majority of the benefits derived from the land-grant system flow to UMCP while the state largely ignores UMES's identical land-grant mission.

137. Thus, UMES's impressive use of meager resources has not been the result of generous state support: they have come in spite of the state's ongoing racial discrimination.

138. Maryland's racially discriminatory treatment of UMES has violated the United States Constitution, federal statutes, federal regulations and common-law principles from UMES's founding through today.

139. In order to right the historic and ongoing wrongs of Maryland's discriminatory treatment against UMES, Maryland must close the gap between its support of UMCP and UMES.

140. This can be accomplished only by: (1) placing UMES on equitable financial footing for both operational and capital expenditures by filling the deficit created by Maryland's discriminatory underfunding from 1890 to the present; (2) ensuring the equitable distribution of state, federal and private funds in support of the land-grant mission in the future; and (3) providing UMES with the autonomy to select its own leadership like Morgan State University.

**C. Scrutiny of Maryland's Discriminatory Treatment of UMES Begins**

141. By 1915, the U.S. Bureau of Education became aware of Maryland's scheme to divert the majority of federal land-grant money to UMCP at the expense of UMES.

142. The Bureau objected to the arrangement on two separate grounds: (1) UMES was providing education on a primarily junior high school level; and (2) UMES was still under control of Morgan College.

143. To address the Bureau's concerns, administrative control of UMES was transferred to UMCP in 1919.

144. In 1927, UMES abandoned instruction for grades eight through ten and added two years of college instruction with a focus on agriculture and home economics.

145. Between 1928 and 1998, several federal and state commissions were tasked to report on the state of Maryland's educational system which included UMES. Despite Maryland's admitted failure to equitably fund UMES and the observations, recommendations, and reminders the State received from the various commissions, Maryland continued its deplorable legacy of white supremacy by illegally withholding federal funds from UMES.

146. On April 21, 1933, the Maryland Legislature passed an act entitled "Negro Education Under the Morrill Act" and made two critical admissions.

147. First, the Maryland Legislature admitted that "[t]he University of Maryland has for many years conducted for negro students of the State of Maryland at Princess Anne, Maryland, **educational work required for them under the Federal Morrill Act of 1862**" (emphasis added).

148. Second, the Maryland Legislature admitted that "**[t]he General Assembly of Maryland has never authorized an apportionment of funds received from the Federal Government under this Act, as required by Federal regulation in those States where education for colored students is given in separate institutions**" (emphasis added).

149. The first admission appears to be the Maryland Legislature's endorsement of President Alvord's racist scheme.

150. The second admission concedes Maryland's complicity in the racist scheme.

151. This Act made a meager attempt to correct this great wrong by including the following mandate:

> "That the funds for residence education now received by the University of Maryland from the Government of the United States under the Morrill Act, now amounting to $50,000 per year, shall be divided on the basis of the population of the State of Maryland as shown by the latest census, **so that a percentum of these funds equal to the percentum of the negro population to the whole population of the State, shall be expended by the Comptroller of the State, upon recommendation of the Regents of the University of Maryland, for the benefit and in the interests of the Princess Anne Academy**."

*Id.*, (emphasis added).

152. Equally stunning, the Maryland Legislature still did nothing to address the State's failure to provide UMES with its fair share of Hatch Act and Smith-Lever Act funding.

153. In other words, the General Assembly weakly attempted to address the Instructional Component of UMES's land-grant mission but failed to even mention the corresponding Research and Public Service Components.

154. By 1935, UMES had extended its college courses to four years and offered degrees in agriculture and mechanic arts.

155. In April of that same year, the Maryland Legislature authorized Maryland's purchase of UMES.

156. Also in that same year, UMCP President H. C. "Curley" Byrd stated that: "*If we don't do something about Princess Anne* [which at the time was the only state funded Black college in Maryland] *we're going to have to accept Negroes at College Park, where our girls are.*"

157. In that same year, UMCP consolidated its math, physics, geology, and later computer science programs, into the College of Computer, Mathematical, and Physical Sciences ("CMPS").

### D. The United States Office of Civil Rights Steps In

158. In 1969, the United States Office of Civil Rights ("OCR") informed Maryland, "that it is one of ten states operating a racially segregated system of education in violation of Title VI of the Civil Rights Act."

159. Notably, the 1969 OCR Report focused solely on the traditional academic mission of Maryland's educational system as a whole. The Report did not address the vast disparities in the unique academic, research, and extension components of the land-grant mission shared by only the University of Maryland and Maryland State College.

160. Over the ensuing decades, OCR unsuccessfully sought an effective plan for dismantling the dual system and eliminating the vestiges of segregation in Maryland's higher education system.

161. Beginning in the mid-1970's, apparently in recognition of the fact that many states were failing to equitably allocate funds from certain Acts such as Hatch and Smith-Lever to their 1890 land-grant colleges, Congress enacted several statutes to provide additional funding specifically designated for the 1890 land-grant colleges (the "HBCU Derivative Statutes").

162. For example, in 1977, Congress passed 7 U.S.C. § 3221, which provides that no less than 20% of Smith-Lever Act funds are to be distributed to 1890 land-grant colleges.

163. In that same year, Congress passed 7 U.S.C. § 3222, which provides that no less than 30% of appropriations for agricultural research under 7 U.S.C. § 361c are to be distributed to 1890 land-grant colleges.

164. In 1976, OCR advised Maryland that it was still not in compliance with its obligations under federal law regarding higher education and threatened to institute an enforcement action that would terminate Maryland's federal financial assistance under Title VI,

42 U.S.C. § 2000d, if the State did not take steps to disestablish the remnants of racial segregation in its higher education system.

165. Because of Maryland's failure to implement an adequate desegregation plan, OCR resumed negotiations with Maryland to develop and implement a new desegregation plan in 1982.

166. Maryland and OCR entered into a consent decree ending the previous litigation and promising that the state would move forward with desegregation of its dual education system, still in place more than 30 years after *Brown*.

167. In 1985, OCR and Maryland agreed on another statewide desegregation plan in order to bring Maryland into compliance with Title VI. It was a five-year plan designed to "foster equal educational opportunity in Maryland's public institutions of higher education."

168. At the end of the five years, OCR was to determine whether or not Maryland had disestablished its segregated system of higher education.

169. The goals of the 1985 desegregation plan were (1) the "continued integration" of Maryland traditionally white institutions ("TWIs") through "enrollment goals, recruitment measures, retention efforts and affirmative action plans;" and (2) "the enhancement of HBCUs to ensure that they are comparable and competitive with TWIs with respect to capital facilities, operating budgets, and new academic programs."

170. The desegregation plan was focused on only academic programs and did not address the disparities in the State's support of UMCP and UMES's identical land-grant missions.

171. Maryland was to submit yearly progress reports regarding these goals.

172. In 1988, the General Assembly designated the University of Maryland as Maryland's flagship campus.

173. Maryland submitted the last of its yearly progress reports in 1991 outlining the results of its desegregation plan.

174. OCR only once commented on Maryland's progress in implementing the 1985 plan.

175. OCR has never found that Maryland complied with Title VI desegregation requirements.

176. Maryland, the only other state not in compliance with the 1969 OCR order, lacked an OCR approved plan to remove the vestiges of their segregated system of higher education.

177. Despite Maryland's commitment to bring UMES's campus into parity with UMCP's campus, the State failed to make any material increases in UMES's capital funding.

178. A review of the USM's 5-year Capital Budget Plans from that timeframe show that proposed escalations of capital projects at UMES did not occur as discussed.

179. For example, some of UMES's capital improvement projects that had been in the 5-year planning window were delayed to accommodate newer capital projects at nearby Salisbury University, where some capital projects, that were not even in the 5-year plan, were completed before UMES's repeatedly delayed Engineering building.

180. Upon information and belief, the State has continually failed to provide the appropriate contracts, contractors, supplies, and appropriations for timely completion of capital projects at UMES.

181. Additionally, a comparison of facilities and infrastructure at UMES compared to UMCP continues to show the same disparities between the campuses that have existed since 1890.

182. This failure is critical in the context of land-grant institutions because federal and state money supporting land-grant missions is directly tied to supporting infrastructure including buildings, laboratories and equipment.

183. UMCP's historic growth demonstrates the principle that, once the proper infrastructure is in place, federal and state land-grant money comes pouring into the college.

184. USM is well aware of this "If You Build It They Will Come" model as evidenced by the explosive growth of the infrastructure supporting UMCP's land-grant missions.

185. This growth has led to UMCP's increased access to federal and state land-grant funds which, in turn, has led to the expansion of new infrastructure supporting UMCP's land-grant mission.

186. USM has taken the opposite approach with UMES, requiring UMES to reach certain student enrollment benchmarks while denying UMES the very infrastructure it needs to reach to those benchmarks. In other words, USM has relegated UMES to the "If They Come, We Will Build It" model.

187. Instead of helping UMES to fulfill its land-grant mission, USM officially forced UMES to justify why the programs should be added when there were no students or infrastructure to support the programs.

**E. The Status of the Land-grant Mission at UMCP and UMES Today**

**i. Instructional Component**

**(a) Agricultural Programs at UMES**

188. The agricultural programs under the Instructional Component of UMES's land-grant mission is today vested in UMES's School of Agriculture and Natural Sciences ("SANS").

189. After 129 years of operation, and consistent with the numerous contemporaneous assessments over that timeframe, the programs offered through UMES's SANS continue to be woefully inferior to UMCP in every way.

190. To this day, the laboratory facilities at UMES pale in comparison to those at UMCP – as they have through the long history of the two campuses.

**(b) Engineering Programs at UMES**

191. As a direct result of 135 years of Defendants' racially discriminatory underfunding, UMES's engineering program is woefully inferior to UMCP's A. James Clark School of Engineering.

192. It has been one hundred and thirty-one (131) years since UMCP started its Mechanical Engineering program in 1894, and UMES still has not been provided the resources to establish a full standalone Mechanical Engineering program that even hints at meeting the academic, research, and public service expectations of a land-grant university.

193. Similarly, it has been one hundred and thirteen (113) years since UMCP started its Electrical Engineering program, and UMES still has not been provided the financial support to offer a credible Electrical Engineering program that meets the academic, research, and public service mission of a mature land-grant university.

**(e) Other Applied Science Programs at UMES**

194. Unsurprisingly, as a direct result of 135 years of Defendants' racially discriminatory underfunding, UMES does not have any programs that are remotely equivalent to UMCP's CMNS.

**ii. Research Component**

**(a) Agricultural Programs at UMES**

195. As a direct result of 135 years of Defendants' racially discriminatory underfunding, UMES's SANS operates a *single* research station located entirely in Somerset County.

196. SANS's single Agricultural Research Station supports only six programs: the Center for Agribusiness & Economic Development; Center for Obesity Prevention; Center for Food Safety, Science & Technology; Chesapeake Water Quality Center; International Center for

Personal Protective Equipment of Pesticide Operators & Re-entry Workers; and Center for Integrated Pest Management.

**iii. Public Service Component**

**(a) Agricultural Programs at UMES**

197. As a direct result of 111 years of Defendants' racially discriminatory underfunding, UMES's participation in UME remains in an intentionally inferior position to UMCP.

198. Of the some 400 State-wide UME employees, only 50 are employed by UMES.

199. Furthermore, given the intentionally limited scope of the Research Component of UMES's land-grant mission, the Public Service Component of UMES's land-grant mission is likewise severely limited.

200. While UMES's extension services are funded through NIFA and State and local governments, funds for the Public Service Component UMES's land-grant mission intentionally remain only a small fraction of those provided to UMCP.

**F. Continuing Racial Discrimination in Leadership Appointments**

201. As a result of the scourge of white supremacy, the governing bodies responsible for UMES' well-being have ignored the institution since its inception.

202. The same organized racist disregard and lack of interest from the individuals ultimately responsible for administrative oversight of UMES in its formative years continue today.

203. In 1988, the University of Maryland was combined with the Board of Trustees schools to form the University System of Maryland.

204. The divergence in funding per FTE between UMCP and UMES marked a return to UMES's treatment as a traditional institution with only an academic mission.

205. In 2012, the Board of Regents appointed Dr. Juliette Bell as the President of UMES despite the fact that, upon information and belief, she was not on the original slate of candidates recommended by the UMES Presidential Search Committee due to her limited experience as an academic administrator.

206. Moreover, Dr. Bell was the Chief Academic Officer at Fayetteville State University when it lost accreditation of its Nursing Program.

207. Enrollment under President Bell initially faltered but briefly rebounded under Chancellor Kirwan.

208. After Dr. Kirwan's retirement, Robert L. Caret served as the Chancellor of the USM from July 1, 2015, to January 6, 2020.

209. Dr. Caret was President of Towson University when Towson University duplicated the MBA program at Morgan State University – one of the actions that precipitated the Coalition lawsuit.

210. Enrollment at UMES plummeted immediately after Chancellor Caret took office.

211. From Fall 2015 to Fall 2019 enrollment at UMES dropped from 4,148 to 2,668 – a 35.7% decline.

212. The following Fall, under Chancellor Caret, UMES's enrollment dropped to 2,412 – a 41.9% decline since he took office.

213. Despite multiple written requests for the Board of Regents to take action to save UMES, the Board of Regents took no meaningful action to resolve UMES's legacy problems.

214. No other institution in USM history had previously seen such a dramatic decline in enrollment. It is inconceivable this type of decline would be tolerated at UMCP without immediate intervention by the Board of Regents.

215. Furthermore, under Chancellor Caret and President Bell, academic integrity at UMES was gutted.

216. The accreditation for UMES's Physician Assistant program was put on probation in October 2015.

217. In September 2016, UMES lost the accreditation for its Physician Assistant ("PA") program.

218. Accommodation was made for students who were already enrolled in the program to continue their studies at other PA programs in the USM at a substantial cost.

219. Students also had the option to transfer to Towson University, Chancellor Caret's former institution, to complete their PA program.

220. In 2017, UMES's School of Pharmacy was also at risk of losing its accreditation.

221. The Accreditation Council for Pharmacy Education ("ACPE") rated the Pharmacy Program physical facilities as "less than adequate" due, in part, to the fact that the Program was spread across five separate campus buildings.

222. The APCE also determined that the Program lacked dedicated animal care facilities and sufficient laboratory space to support the number of growing graduate programs.

223. These deficiencies led to a "partially compliant" status for the Program's physical facilities component.

224. To maintain the Program's accreditation, ACPE required UMES to show progress on the design and construction of a centralized building for the School of Pharmacy.

225. Under Chancellor Caret and President Bell, research capacity at UMES was also gutted.

226. When Chancellor Caret took office in July 2015, UMES reported total Sponsored Programs of $21.4M.

227. UMES's situation worsened when the Board of regents appointed Dr. Heidi Anderson as the President of UMES in 2018.

228. Under Dr. Anderson's leadership, enrollment dropped another 25% between 2018 and 2021.

229. In fact, Dr. Anderson, and those in leadership positions under her, have been embattled in litigation brought against them alleging criminal and civil misconduct in violation of the Civil Rights Act, the Fifth and Fourteenth Amendments of the U.S. Constitution, civil conspiracy and various Maryland civil torts.

**G. Continuing Racial Discrimination in Capital Projects**

230. Defendants' racially discriminatory history of refusing to invest in capital projects and facilities supporting UMES's land-grant mission is well-documented in contemporaneous reports conducted by independent parties.

231. That same discrimination continues today as administration after administration refuses to take any action to reverse the course set by their white supremist predecessors.

232. Capital projects at UMCP lead and drive need and continue to be funded in anticipation of future growth and to ensure UMCP is well-positioned to accommodate projected community and industry needs.

233. UMES, on the other hand, has never received even minimally adequate funding for capital projects.

234. Because of systematic racism, capital projects at UMES have always lagged need.

235. When new programs are approved, Defendants consider only the feasibility of adding the Instructional Component of the program and provide no funding for the capital improvements needed to support the Research and Public Service Components.

236. Despite being the sister land-grant college to UMCP and having the same tripartite land-grant mission, capital investment at UMES continues to lag behind even the traditional teaching institutions except UB and FSU.

237. Relegating this discrepancy in funding to the size of the organizations simply ignores the fact that Defendants have intentionally stunted UMES's growth for over a century.

238. As a result of these funding disparities, UMES's physical plant continues to significantly lag behind UMCP.

239. As for its entire history, the physical plant for Maryland's 1890 land-grant university compared to its 1862 land-grant university is pathetic.

**H. Continuing Racial Discrimination in Operating Budgets**

240. The academic portion of UMES's approved programs are often funded only by one-time grant money as opposed to steady sources of State-based financial support.

**I. Continuing Discriminatory Operating Funding Disparities**

241. Despite the findings of numerous commissions, Defendants have deliberately and consistently failed to equitably distribute federal land-grant funds between UMCP and UMES.

242. The trend in total state funding from 1995 through 2005 reported by the Maryland State Archives shows no significant changes for UMES.

243. On September 18, 2023, Miguel Cardona, Ed.D., the U.S. Secretary of Education, and Thomas J. Vilsack, the U.S. Secretary of Agriculture, jointly sent a letter to Governor Moore

stating that Maryland failed to equitably apportion matching state land-grant funding to UMES (the "Joint Letter").

244. The Joint Letter states that in the last 30 years alone, UMES was entitled to an additional $312,181,312 in State money.

245. According to the Maryland Budget Books from 2003-2023, UMCP received $9.5 Billion in operating funds which equates to $12.6 Billion in 2024 dollars.

246. During that same time, UMES received only $747 Million in operating funds, which equates to $988 Million in 2024 dollars.

247. During that same time, UMCP also received $4.7 Billion for capital projects while UMES received only $482 Million.

248. As noted above, the General Assembly's 1933 Negro Education Under the Morrill Act concluded that federal funds under the Morrill Act should be allocated to UMES based on the percentage of Maryland's Black population.

249. According to the U.S. Census data for Maryland from 1890 to 2020, the Black population of Maryland has averaged 20.6%.

250. When the amount of federal underfunding is added to this number, the total amount of Maryland's underfunding rises to $2,919,011,663.95.

251. When the amount of federal underfunding is added to this number, the total amount of Maryland's underfunding rises to $4,695,794,186.95.

252. These numbers are consistent with the data used to determine the amount of UMES's underfunding in the Joint Letter.

## COUNT I – VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964
**(All Defendants in their Official Capacities Only)**

253. Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

254. 42 U.S.C.A. § 2000d ("Title VI of the Civil Rights Act of 1964"), provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

255. 34 C.F.R. § 100.1, *et seq.*, contains regulations implemented by the U.S. Department of Education (the "DoEd") to enforce Title VI of the Civil Rights Act of 1964 with respect to programs administered by the DoEd (the "DoEd Regulations"). *See*, *e.g.*, 34 C.F.R. § 103.1.

256. Appendix A lists programs governed by the DoEd Regulations and specifically includes the Second Morrill Act.

257. 34 C.F.R. § 103.1(b) prohibits discriminatory actions by Defendants and provides, in pertinent part, as follows:

> (b) Specific discriminatory actions prohibited.
>
> (1) A recipient under any program to which this part applies may not, directly or through contractual or other arrangements, on ground of race, color, or national origin:
>
> (i) Deny an individual any service, financial aid, or other benefit provided under the program;
>
> (ii) Provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program;

> (iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any service, financial aid, or other benefit under the program;
>
> . . .
>
> (2) A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

258. The Second Morrill Act's Parity Clause requires Defendants to ensure that UMES is of "like character" as that of UMCP.

259. The Second Morrill Act's Equity Clause requires Defendants to equitably share federal funds flowing from the Second Morrill Act between UMES and UMCP.

260. The Defendants have violated and continue to violate the DoEd Regulations through the following non-exhaustive list of discriminatory actions against Plaintiffs:

a) denying Plaintiffs a land-grant mission-based physical plant and related facilities and equipment in parity with UMCP's land-grant mission-based physical plant and related facilities and equipment;

b) denying Plaintiffs an equitable share of funding under the Second Morrill Act and all subsequent land-grant Acts derived therefrom;

c) failing to provide Plaintiffs with land-grant mission-based educational programs and opportunities in parity with UMCP's land-grant mission-based educational programs and opportunities;

d) subjecting Plaintiffs to a racially segregated land-grant mission-based post-secondary education by implementing policies that perpetuate de jure era segregation; and

e) making determinations regarding the types of land-grant mission-based buildings, facilities, equipment, educational programs, and the allocation of

> federal land-grant funding at UMES utilizing criteria and methods of administration which have the effect of subjecting the students at UMES to discrimination because of their race and substantially impairing accomplishment of the objectives of the educational component of UMES's land-grant mission.

261. 7 C.F.R. § 15.1, *et seq.*, contains the regulations implemented by the U.S. Department of Agriculture to enforce Title VI of the Civil Rights Act of 1964 with respect to programs administered through the USDA (the "USDA Regulations").

262. Appendix A lists programs governed by this subpart and specifically includes, but is not limited to, the Hatch Act, the Smith-Lever Act, and the McIntire-Stennis Act.

263. The Second Morrill Act's Parity Clause requires Defendants to ensure that UMES is of "like character" as that of UMCP, including agricultural experimentation under the Hatch Act and agricultural extension services under the Smith-Lever Act.

264. The Second Morrill Act's Equity Clause requires Defendants to equitably share federal funds and state matching funds flowing from the Hatch Act the Smith-Lever Act between UMES and UMCP.

265. 7 C.F.R. § 15.3(b) prohibits discriminatory actions by Defendants and provides, in pertinent part, as follows:

> (b) Specific discriminatory actions prohibited.
>
> (1) A recipient under any program to which the regulations in this part apply may not, directly or through contractual or other arrangements on the ground of race, color, or national origin:
>
> (i) Deny an individual any service, financial aid, or other benefit provided under the program;
>
> (ii) Provide any service, financial aid, or other benefit, to an individual which is different, or is provided in a different manner, from that provided to others under the program;

> (iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any service, financial aid, or other benefit under the program;
>
> (iv) Restrict an individual in any way in the enjoyment of any advantage or privilege, enjoyed by others receiving any service, financial aid, or other benefit under the program;
>
> . . .
>
> (vi) Deny an individual an opportunity to participate in the program through the provisions of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program (including the opportunity to participate in the program as an employee but only to the extent set forth in paragraph (c) of this section).
>
> . . .
>
> (2) A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin.

266. The Defendants have violated and continue to violate the USDA Regulations through the following non-exhaustive list of discriminatory actions against Plaintiffs:

a) denying Plaintiffs facilities and equipment to fulfill the agricultural experimentation and extension components of UMES's land-grant mission that are in parity with UMCP's agricultural experimentation and extension facilities and equipment;

b) denying Plaintiffs an equitable share of federal funding under the Hatch Act, Smith-Lever Act, and all subsequent land-grant Acts derived therefrom;

c) denying Plaintiffs an equitable share of State matching funds under the Hatch Act, Smith-Lever Act, and all subsequent land-grant Acts derived therefrom;

d) failing to provide Plaintiffs with land-grant mission-based experimentation and extension programs and opportunities in parity with UMCP's land-grant mission-based experimentation and extension programs and opportunities;

e) subjecting Plaintiffs to a racially segregated land-grant mission-based post-secondary education by implementing policies that perpetuate de jure era segregation; and

f) making determinations regarding the types of land-grant mission-based facilities, equipment, agricultural experimentation and extension programs, and the allocation of federal land-grant funding and State matching funds at UMES utilizing criteria and methods of administration which have the effect of subjecting the students at UMES to discrimination because of their race and substantially impairing accomplishment of the objectives of the agricultural experimentation and extension components of UMES's land-grant mission.

**COUNT II – VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT UNDER *FORDICE* UNDER 42 U.S.C. § 1983**
**(All Defendants in their Individual Capacities Only)**

267. Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

268. Defendants have engaged in a pattern and practice of intentional discrimination against Plaintiffs in violation of the Equal Protection Clause of the Fourteenth Amendment and under *Fordice*, *supra*.

269. UMES remains racially identifiable.

270. Defendants have continued to operate a segregated system of higher education with respect to UMCP and UMES and continue to take actions to perpetuate that segregated system in violation of the Equal Protection Clause, through the following non-exhaustive list of discriminatory and segregative policies:

271. The discriminatory and segregative underfunding enumerated above perpetuate UMES's racial identifiability.

272. The discriminatory and segregative underfunding enumerated above have absolutely no educational justification.

273. The discriminatory and segregative underfunding enumerated above can be practicably eliminated.

274. In order to eliminate these vestiges of de jure segregation, the Defendants must: (1) achieve parity between UMCP's and UMES's respective physical plants and land-grant mission-based facilities and equipment; (2) achieve parity between UMCP's and UMES's respective agricultural and mechanical educational programs; (4) achieve parity between UMCP's and UMES's respective agricultural experimentation stations; (5) achieve parity between UMCP's and UMES's respective agricultural extension services; (6) achieve equitable distribution of federal land-grant funds between UMCP and UMES; (7) achieve equitable distribution of state matching funds between UMCP and UMES; and (8) achieve equitable access to competitive land-grant mission-based federal, state and private grants, contracts and appropriations between UMCP and UMES.

**COUNT III – VIOLATION OF THE EQUAL PROTECTION CLAUSE**
**<u>OF THE FOURTEENTH AMENDMENT UNDER 42 U.S.C. § 1983</u>**
**(All Defendants in their Individual Capacities Only)**

275. Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

276. Section 1 of the Equal Protection Clause of the Fourteenth Amendment states, in pertinent part, that a state may not "deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1.

277. Defendants have engaged, and continue to engage, in a clear, unambiguous, and consistent pattern of discrimination against the Black students at UMES since the school's inception as evidenced by the following non-exhaustive list of discriminatory actions:

a. denying Plaintiffs a land-grant mission-based physical plant and related facilities and equipment in parity with UMCP's land-grant mission-based physical plant and related facilities and equipment;

b. denying Plaintiffs an equitable share of funding under the Second Morrill Act and all subsequent land-grant Acts derived therefrom;

c. failing to provide Plaintiffs with land-grant mission-based educational programs and opportunities in parity with UMCP's land-grant mission-based educational programs and opportunities;

d. subjecting Plaintiffs to a racially segregated land-grant mission-based post-secondary education by implementing policies that perpetuate de jure era segregation;

e. making determinations regarding the types of land-grant mission-based buildings, facilities, equipment, educational programs, and the allocation of federal land-grant funding at UMES utilizing criteria and methods of administration which have the effect of subjecting the students at UMES to discrimination because of their race and substantially impairing accomplishment of the objectives of the educational component of UMES's land-grant mission;

f. denying Plaintiffs facilities and equipment to fulfill the agricultural experimentation and extension components of UMES's land-grant mission that are in parity with UMCP's agricultural experimentation and extension facilities and equipment;

g. denying Plaintiffs an equitable share of federal funding under the Hatch Act, Smith-Lever Act, and all subsequent land-grant Acts derived therefrom;

h. denying Plaintiffs an equitable share of State matching funds under the Hatch Act, Smith-Lever Act, and all subsequent land-grant Acts derived therefrom;

i. failing to provide Plaintiffs with land-grant mission-based experimentation and extension programs and opportunities in parity with UMCP's land-grant mission-based experimentation and extension programs and opportunities;

j. denying Plaintiffs access to an equitable share of state general funding support for land-grant based academic programs;

k. subjecting Plaintiffs to a racially segregated land-grant mission-based post-secondary education by implementing policies that perpetuate de jure era segregation; and

l. making determinations regarding the types of land-grant mission-based facilities, equipment, agricultural experimentation and extension programs, and the allocation

of federal land-grant funding and State matching funds at UMES utilizing criteria and methods of administration which have the effect of subjecting the students at UMES to discrimination because of their race and substantially impairing accomplishment of the objectives of the agricultural Research and Public Service components of UMES's land-grant mission.

278. Defendants' discrimination against the Black students at UMES was grounded, and continues to be grounded, in de jure segregation, racial animus and a state-sanctioned fraudulent scheme to deprive the Black students at UMES of their entitlement to educational facilities of like character as those of UMCP and an equitable share of federal and state land-grant funds.

279. The specific sequence of events leading up Defendants' discrimination against the Black students at UMES is a straight line of racial discrimination with its origin in de jure segregation.

280. Defendants have temporarily deviated from this shameful history of racial discrimination only when compelled to do so by outside forces such as the OCR and the courts.

281. Even then, Defendants consistently fail to meet their legal obligations to dismantle the vestiges of de jure segregation and soon revert to their discriminatory practices.

282. The foregoing analysis conclusively demonstrates clear, intentional, and pervasive usage of racially discriminatory classification in Defendants' legislative and administrative actions with respect to UMES.

283. The equal protection analysis of Defendants' usage of this racially discriminatory classification is comprised of a substantive component and a procedural component.

284. The substantive component examines whether the end Defendants seek to achieve through usage of racially discriminatory classifications is a legitimate governmental purpose.

285. While courts are cautious to second-guess a state's legislative process, the substantive component of the analysis will not condone, "a 'pernicious legislative purpose or one that does not comport with traditional notions of the proper role of government.'"

286. Defendants' racially discriminatory actions against the students of UMES as outlined above are the very definition of pernicious legislative purpose and are antithetical to the traditional notions of the proper role of government.

287. The procedural component of the equal protection analysis examines whether Defendants' racially discriminatory classifications appropriately further the legislative purpose.

288. Defendants' failure to satisfy the substantive component of the equal protection analysis effectively ends the equal protection analysis; however, Defendants' usage of racially discriminatory classifications also fails the procedural component of the analysis.

289. Defendants' usage of racially discriminatory classifications in their legislative and administrative actions with respect to UMES are subjected to strict scrutiny and can be sustained only if those actions are suitably tailored to serve a compelling state interest.

290. Defendants' long-standing desire to perpetuate segregation and discriminate against and marginalize the students at UMES is odious to the people of Maryland and the United States and, by definition, does not qualify as a "most exceptional circumstance."

## RELIEF REQUESTED

Plaintiffs demand judgment against Defendants jointly and severally for the following:

1. Money damages for the historic inequitable allocation of federal funds under the Second Morrill Act and all subsequent land-grant Acts derived therefrom;

2. Money damages for the historic inequitable allocation of federal funds and State matching funds under the Hatch Act, Smith-Lever Act and all subsequent land-grant Acts derived therefrom;

3. Money damages to finally bring UMES's land-grant based physical plant into parity with UMCP's land-grant based physical plant;

4. Money damages to finally bring UMES the facilities and equipment associated with UMES's agricultural experimentation and extension programs into parity with UMCP's agricultural experimentation and extension programs;

5. Injunctive relief requiring Defendants to allocate all future federal land-grant funding and State matching funds equitably between UMCP and UMES;

6. Injunctive relief requiring Defendants to promptly and adequately fund all future land-grant based capital improvement projects at UMES;

7. Injunctive relief under *Milliken v. Bradley*, 433 U.S. 267, 97 S. Ct. 2749, 53 L.Ed.2d 745 (1977), requiring Defendants to promptly and adequately fund land-grant mission-based courses and supporting instructional support at UMES that are of like kind and character as those offered at UMCP;

8. Injunctive relief requiring Defendants to equitably allocate all future general funds appropriations;

9. Injunctive relief enabling UMES to appoint its own leadership;

10. Injunctive relief placing the governance of UMES in a board independent of the Board of Regents;

11. Reasonable attorney's fees and costs to Plaintiffs' counsel pursuant to 42 U.S.C. § 1988;

12. Pre- and post-judgment interest; and

13. All other relief the Court deems just and equitable.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendants in the total aggregate amount of Six Billion Dollars ($6,000,000,000.00), inclusive of all damages, injunctive relief, interest, costs, and any attorney's fees recoverable under applicable law.

## V. JURY DEMAND

Plaintiffs hereby demand a trial by jury upon all issues raised herein triable by jury.

**PLAINTIFFS,**

**By Counsel:**

**PETER ANGELOS LAW**

By: /s/ *Jay D. Miller*
Jay D. Miller, Federal Bar #04653

/s/ *Ronald E. Richardson*
Ronald E. Richardson, Federal Bar #04673

One Charles Center
100 N. Charles Street, 21" Floor
Baltimore, Maryland 21201
jmiller@lawpga.com
rrichardson@lawpga.com
Telephone: (410) 649-2000
Facsimile: (410) 649-2150

**MURPHY, FALCON & MURPHY**

By: /s/ *William H. Murphy*
William H. Murphy, Jr., Bar #07985

/s/ *Jason P. Foster*
Jason P. Foster, Bar #77702

One South Street, 30th Floor
Baltimore, MD 21202
billy.murphy@murphyfalcon.com
jason.foster@murphyfalcon.com
Telephone: (410) 951-8744
Facsimile: (410) 539-6599

*Attorneys for Plaintiffs*